# EXHIBIT 5

# PROJECT LOAN NOTE

Date of Note: As of August 20, 2008

Amount of Note: $349,669

Maturity Date: September 30, 2010

Interest Rate: Base Rate or the Libor Rate, as set forth below, unless the Involuntary Rate (as herein defined) is applicable.

FOR VALUE RECEIVED, the undersigned, having an address as indicated under its name below (herein called the "**Borrower**"), **HEREBY PROMISES TO PAY ON THE MATURITY DATE**, to the order of **BANCO POPULAR NORTH AMERICA,** a New York banking corporation, its successors and/or assigns ("**Lender**") at its offices at 120 Broadway, 16th Floor, New York, New York 10271, or at such other place as the holder hereof may from time to time designate in writing, in lawful money of the United States, in immediately available New York funds, without counterclaim or setoff and free and clear of, and without deduction or withholding for, any taxes or other payments, the Amount of Note, or so much thereof as may be advanced by Lender, pursuant to that certain project loan agreement dated of even date herewith (the "**Project Loan Agreement**") between Borrower and Lender (the "**Principal Amount**"), together with interest on the Principal Amount or on so much thereof as may from time to time remain unpaid at the Interest Rate, or the Involuntary Rate (hereinafter defined), if applicable, which shall be computed on an actual 360-day basis (i.e., all computations of interest under this Note shall be made on the basis of a three hundred sixty (360) day year and the actual number of days elapsed). Interest shall be payable monthly on the first day of the first month following the first advance under the Project Loan Agreement and on the first day of each month thereafter until this Note is paid in full.

Interest Rates. The Principal Amount from day to day outstanding which is not past due shall bear interest at a rate per annum equal to the following (computed as provided below) as applicable:

    (a)    On Base Rate Principal, on any day, the Base Rate; and

    (b)    On LIBOR Rate Principal, for the applicable Interest Period, the applicable LIBOR Rate.

Interest Rate Elections.

    (a)    Subject to the conditions and limitations in this Note, Borrower shall be deemed to (a "Rate Election Notice"):

        (i)    Elect, for a new advance of funds, that such Principal Amount will be LIBOR Rate Principal unless it is not commercially feasible for Lender to provide the LIBOR Rate, as hereinafter provided;

(ii) Elect to convert, on a LIBOR Business Day, all or part of Base Rate Principal into LIBOR Rate Principal; or

(iii) Elect to continue, commencing on the last day of the Interest Period applicable thereto, any LIBOR Rate Principal.

If, for any reason, an effective election is not made in accordance with the terms and conditions of this Note for any principal advance or for any LIBOR Rate Principal for which the corresponding Interest Period is expiring, or to convert Base Rate Principal to LIBOR Rate Principal, then the sums in question will be deemed to bear interest at the LIBOR Rate.

(b) Each Rate Election Notice must be received by Lender not later than 10:00 a.m. on the applicable date as follows:

(i) three (3) LIBOR Days prior to the proposed date of advance.

Unless otherwise specified herein, no conversion from LIBOR Rate Principal may be made other than at the end of the corresponding Interest Period. All such notices shall be irrevocable once given, and shall be deemed to have been given only when actually received by Lender in writing in a form specified by Lender.

2. General Conditions Precedent to LIBOR Rate Election. In addition to any other conditions herein, a LIBOR Rate Election shall not be permitted if:

(a) After giving effect to the requested LIBOR Rate Election, the sum of all LIBOR Rate Principal plus all Base Rate Principal would exceed the principal face amount of this Note; or

(b) Any of the circumstances referred to in the Section of this Note with a heading "Unavailability of Rate" below shall apply with respect to the requested LIBOR Rate Election or the requested LIBOR Rate Principal.

3. Determinations. Lender shall determine each interest rate applicable to the Principal Amount in accordance with this Note and its determination thereof shall be conclusive in the absence of manifest error. The books and records of Lender shall be conclusive evidence, in the absence of manifest error, of all sums owing to Lender from time to time under this Note, but the failure to record any such information shall not limit or affect the obligations of Borrower under the Loan Documents.

4. Unavailability of Rate. If, with respect to any LIBOR Rate Election, or any LIBOR Rate Principal outstanding hereunder, Lender determines that no adequate basis exists for determining the LIBOR Rate or that the LIBOR Rate will not adequately and fairly reflect the cost to Lender of funding or maintaining the applicable LIBOR Rate Principal for such Interest Period, or that any applicable Law (hereinafter defined), or any request or directive (whether or not having the force of law) of any Tribunal (hereinafter defined), or compliance therewith by Lender, prohibits or restricts or makes impossible the making or maintaining of such LIBOR Rate Election or LIBOR Rate Principal or the charging of interest on such LIBOR Rate Principal, and Lender so notifies Borrower, then until Lender notifies Borrower that the

2

circumstances giving rise to such suspension no longer exist, (a) the obligation of Lender to permit such LIBOR Rate Election shall be suspended and (b) all existing affected LIBOR Rate Principal shall automatically become Base Rate Principal, either (i) on the last day of the corresponding Interest Period (if Lender determines that it may lawfully continue to fund and maintain the affected LIBOR Rate Principal to such day); or (ii) immediately (if Lender determines that it may not lawfully continue to fund and maintain the affected LIBOR Rate Principal to such day) and in such case Borrower shall pay to Lender the Consequential Loss, if any, pursuant to the Section of this Note with a heading "Prepayment" below.

5. <u>Increased Cost and Reduced Return</u>. If at any time after the date hereof, Lender (which shall include, for purposes of this paragraph, any corporation controlling Lender) determines that the adoption or modification of any applicable Law regarding taxation, Lender's required levels of reserves, deposits, insurance or capital (including any allocation of capital requirements or conditions), or similar requirements, or any interpretation or administration thereof by any Tribunal or compliance by Lender with any of such requirements, has or would have the effect of (a) increasing Lender's costs related to the Indebtedness, or (b) reducing the yield or rate of return of Lender on the Indebtedness, to a level below that which Lender could have achieved but for the adoption or modification of any such requirements, Borrower shall, within fifteen (15) days of any request by Lender, pay to Lender such additional amounts as (in Lender's sole judgment, after good faith and reasonable computation) will compensate Lender for such increase in costs or reduction in yield or rate of return of Lender. No failure by Lender to immediately demand payment of any additional amounts payable hereunder shall constitute a waiver of Lender's right to demand payment of any such amounts at any subsequent time. Nothing herein contained shall be construed or shall so operate as to require Borrower to pay any interest, fees, costs or charges greater than is permitted by applicable Law.

6. <u>Involuntary Rate</u>. If any amount payable by Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), such amount shall thereafter bear interest at the Involuntary Rate (as defined below) to the fullest extent permitted by applicable Law. Accrued and unpaid interest or past due amounts (including interest on past due interest) shall be due and payable on demand, at a fluctuating rate per annum (the "**Involuntary Rate**") equal to the higher of (a) the Prime Rate plus five hundred (500) basis points, or (b) the Adjusted LIBOR Rate plus five hundred (500) basis points.

7. <u>Additional Defined Terms</u>. In addition to other terms defined herein, as used herein the following terms shall have the meanings indicated, unless the context otherwise requires:

"<u>Adjusted LIBOR Rate</u>" means the quotient obtained by dividing (a) the applicable London Interbank Offered Rate by (b) 1.00 minus the LIBOR Reserve Percentage.

"<u>Base Rate</u>" means, on any day, a simple rate per annum equal to the sum of the Prime Rate for that day plus the Base Rate Margin. Without notice to Borrower or anyone else, the Base Rate shall automatically fluctuate upward and downward as and in the amount by which the Prime Rate fluctuates.

"<u>Base Rate Margin</u>" means five hundred (500) basis points.

3

"Base Rate Principal" means, at any time, the Principal Amount minus the portion, if any, of such Principal Amount which is LIBOR Rate Principal.

"Indebtedness" means any and all of the indebtedness to Lender evidenced, governed or secured by or arising under this Note or any other Loan Document.

"Interest Period" means with respect to any LIBOR Rate Principal, the period commencing on the date such LIBOR Rate Principal is disbursed or on the date on which the Principal Amount or any portion thereof is converted into or continued as such LIBOR Rate Principal, and ending on the date one (1) month thereafter; provided that:

    (i)    Each Interest Period must commence on a LIBOR Business Day;

    (ii)    In the case of the continuation of LIBOR Rate Principal, the Interest Period applicable after the continuation of such LIBOR Rate Principal shall commence on the last day of the preceding Interest Period;

    (iii)    The last day of each Interest Period and the actual number of days during the Interest Period shall be determined by Lender using the practices of the London Interbank market; and

    (iv)    No Interest Period shall extend beyond the Maturity Date, and any Interest Period which begins before the Maturity Date and would otherwise end after the Maturity Date shall instead end on the Maturity Date.

"Laws" means all constitutions, treaties, statutes, laws, ordinances, regulations, rules, orders, writs, injunctions, or decrees of the United States of America, any state or commonwealth, any municipality, any foreign country, any territory or possession, or any Tribunal.

"LIBOR Business Day" means a Business Day which is also a London Banking Day.

"LIBOR Margin" means two hundred fifteen (215) basis points.

"LIBOR Rate" means for any applicable Interest Period for any LIBOR Rate Principal, a simple rate per annum equal to the sum of the LIBOR Margin plus the Adjusted LIBOR Rate.

"LIBOR Rate Election" means an election or deemed election by Borrower of LIBOR Rate in accordance with this Note.

"LIBOR Rate Principal" means any portion of the Principal Amount which bears interest at an applicable LIBOR Rate at the time in question.

"LIBOR Reserve Percentage" means, with respect to any applicable Interest Period, for any day that percentage (expressed as a decimal) which is in effect on such day, as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including basic, supplemental, emergency, special and marginal reserves) generally applicable to financial institutions regulated by the Federal Reserve Board

4

comparable in size and type to Lender, in respect of "Eurocurrency liabilities" (or in respect of any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR Rate Principal is determined), whether or not Lender has any Eurocurrency liabilities or such requirement otherwise in fact applies to Lender. The LIBOR Rate shall be adjusted automatically as of the effective date of each change in the LIBOR Reserve Percentage.

"London Banking Day" means a day on which banks in London are open for business and dealing in offshore dollars.

"London Interbank Offered Rate" means, with respect to any applicable Interest Period, the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as selected by Lender from time to time) at approximately 11:00 a.m. London time two (2) London Banking Days before the commencement of the Interest Period, for deposits in U.S. Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the rate for that Interest Period will be determined by such alternate method as reasonably selected by Lender.

"Note" means this promissory note, and any renewals, extensions, amendments or supplements hereof.

"Potential Default" means any condition or event which with the giving of notice or lapse of time or both would, unless cured or waived, become an Event of Default.

"Prime Rate" means, on any day, the rate of interest per annum then most recently established by Lender as its "prime rate," it being understood and agreed that such rate is set by Lender as a general reference rate of interest, taking into account such factors as Lender may deem appropriate, that it is not necessarily the lowest or best rate actually charged to any customer or a favored rate, that it may not correspond with future increases or decreases in interest rates charged by other lenders or market rates in general, and that Lender may make various business or other loans at rates of interest having no relationship to such rate. If Lender (including any subsequent holder of this Note) ceases to exist or to establish or publish a prime rate from which the Prime Rate is then determined, the applicable variable rate from which the Prime Rate is determined thereafter shall be instead the prime rate reported in The Wall Street Journal (or the average prime rate if a high and a low prime rate are therein reported), and the Prime Rate shall change without notice with each change in such prime rate as of the date such change is reported.

"Tribunal" means any state, commonwealth, federal, foreign, territorial or other court or governmental department, commission, board, bureau, district, authority, agency, central bank, or instrumentality, or any arbitration authority.

    8.    Prepayment.

        (a)    Borrower may prepay the principal balance of this Note, in full at any time or in part from time to time, provided that: (i) no prepayment may be made which in Lender's judgment would contravene or prejudice funding under any applicable permanent loan commitment or tri-party agreement or the like; (ii) Lender shall have actually received from

Borrower prior irrevocable written notice (the "Prepayment Notice") of Borrower's intent to prepay, the amount of principal which will be prepaid (the "Prepaid Principal"), and the date on which the prepayment will be made; (iii) each prepayment shall be in the amount of $1,000 or larger; and (iv) each prepayment shall be in the amount of 100% of the Prepaid Principal, plus accrued unpaid interest thereon to the date of prepayment, plus any other sums which have become due to Lender under the Loan Documents on or before the date of prepayment but have not been paid; and (v) no portion of LIBOR Rate Principal may be prepaid except on the last day of the Interest Period applicable thereto, unless (X) the prior written consent of Lender is obtained which consent, if given, shall provide, without limitation, the manner and order in which the prepayment is to be applied to the Indebtedness, and (Y) Borrower pays to Lender any Consequential Loss as a result thereof, in accordance with Section 4(b) below. If this Note is prepaid in full, any commitment of Lender for further advances shall automatically terminate. No Prepaid Principal may be reborrowed.

(b) Within fifteen (15) days after request by Lender (or at the time of any prepayment), Borrower shall pay to Lender such amount or amounts as will compensate Lender for any loss, cost, expense, penalty, claim or liability, including any loss incurred in obtaining, prepaying, liquidating or employing deposits or other funds from third parties and any loss of revenue, profit or yield, as determined by Lender in its judgment reasonably exercised (together, "Consequential Loss") incurred by Lender with respect to any LIBOR Rate, including any LIBOR Rate Election or LIBOR Rate Principal as a result of: (i) the failure of Borrower to make any payment on the date or in the amount specified in any Prepayment Notice from Borrower to Lender; (ii) the failure of Borrower to borrow, continue or convert into LIBOR Rate Principal on the date or in the amount specified in any Rate Election Notice or other notice given by Borrower to Lender; (iii) the early termination of any Interest Period for any reason; or (iv) the payment or prepayment of any amount on a date other than the date such amount is required or permitted to be paid or prepaid. Borrower agrees to pay all Consequential Loss upon any prepayment of LIBOR Rate Principal, whether voluntary or involuntary, whether effected by a credit bid at foreclosure, or whether by reason of acceleration upon an Event of Default or upon any transfer or conveyance of any right, title or interest in the Property giving Lender the right to accelerate the maturity of this Note as provided in the Mortgage. Notwithstanding the foregoing, the amount of the Consequential Loss shall never be less than zero or greater than is permitted by applicable Law. Lender shall provide a notice to Borrower setting forth Lender's determination of any Consequential Loss, which notice shall be conclusive and binding in the absence of manifest error. Lender reserves the right to provide interim calculations of such Consequential Loss in any notice of default or notice of sale for information purposes, but the exact amount of such Consequential Loss shall be calculated only upon the actual prepayment of LIBOR Rate Principal as described herein. The Consequential Loss shall be included in the total indebtedness secured by the Mortgage for all purposes, including in connection with a foreclosure sale. Lender may include the amount of the Consequential Loss in any credit bid Lender may make at a foreclosure sale. Lender shall have no obligation to purchase, sell and/or match funds in connection with the funding or maintaining of the Loan or any portion thereof. The obligations of Borrower under this Section shall survive any termination of the Loan Documents and payment of this Note and shall not be waived by any delay by Lender in seeking such compensation.

This Note is secured by, *inter alia*, and the parties hereto are entitled to the benefits of that certain project loan mortgage, assignment of leases and rents and security agreement of even date herewith (which, as now exists, and as the same may hereafter, from time to time, be amended, modified, extended, consolidated, increased, supplemented, spread or restated is hereinafter referred to as the "**Mortgage**"), made by the Borrower to the Lender, encumbering, among other things, certain real property and improvements now or hereafter located on said real property and such other property and interests as more particularly described in the Mortgage (the "**Mortgaged Property**"), which Mortgage specifies various Events of Default upon the occurrence of any of such Events of Default, all sums due and owing on this Note may, at Lender's option, be declared immediately due and payable. This Note is executed and delivered pursuant to the Project Loan Agreement. All of the covenants, conditions and agreements of the Project Loan Agreement and the Mortgage, being made a part hereof by this reference.

Borrower acknowledges and agrees that Lender has no obligation to fund any advance under the Project Loan Agreement at any time after the Maturity Date.

Any payment made hereunder, whether categorized as a principal payment or otherwise, shall first be applied to the payment of costs and expenses for which Borrower is liable hereunder or under the Mortgage, next to the payment of accrued and unpaid interest, and lastly to a reduction of the Principal Amount.

All agreements between Borrower and Lender are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration or maturity of the indebtedness evidenced hereby or otherwise, shall the amount paid or agreed to be paid to Lender for the use or the forbearance of the indebtedness evidenced hereby exceed the maximum permissible under applicable law. As used herein, the term "applicable law" shall mean the law in effect as of the date hereof provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Note shall be governed by such new law as of its effective date. In this regard, it is expressly agreed that it is the intent of Borrower and Lender in the execution, delivery and acceptance of this Note to contract in strict compliance with the laws of the State of New York from time to time in effect. If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the loan documents which evidence and/or secure this Note at the time of performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if under or from any circumstances whatsoever Lender should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest. This provision shall control every other provision of all agreements between Borrower and Lender.

Borrower promises to pay all costs, expenses and reasonable attorneys' fees incurred by the holder hereof in the exercise of any remedy (with or without litigation), in any proceeding for the collection of the debt evidenced by this Note, in any trustee's sale or foreclosure of the Mortgage or the realization upon any other security securing this Note, in protecting or sustaining the lien or priority of said Mortgage or said other security, or in any litigation or controversy arising from or connected with this Note, the Project Loan Agreement, or any

7

security for or guaranty of this Note. Said proceedings shall include, without limitation, any probate, bankruptcy, receivership, injunction, arbitration, mediation, or other proceeding, or any appeal from or petition for review of any of the foregoing, in which the holder hereof appears to enforce the Project Loan Agreement, collect the debt evidenced by this Note or protect its security for this Note. Borrower shall also pay all of Lender's costs and reasonable attorneys' fees incurred in connection with any demand, workout, settlement, compromise or other activity in which Lender engages to collect any portion of the debt evidenced by this Note not paid when due or as a result of any default of Borrower. If a judgment is obtained hereon which includes an award of attorneys' fees, such attorneys' fees, costs and expenses shall be in such amount as the court shall deem reasonable, such judgment shall bear interest at the Involuntary Rate from the date it is rendered to and including the date of payment to Lender.

Borrower hereby waives valuation and appraisement, demand, presentment for payment, notice of dishonor, protest and notice of protest of this Note.

Any notice, demand or request relating to any matter set forth herein shall be in writing and shall be deemed effective and given as provided in the Mortgage.

This Note and the rights and obligations of the parties hereunder shall in all respects be governed by, and construed and enforced in accordance with, the laws of the State of New York (without giving effect to New York's principles of conflicts of law). Borrower hereby irrevocably submits to the non-exclusive jurisdiction of any New York State or Federal court sitting in the City of New York (or any county in New York State where any portion of the Mortgaged Property is located) over any suit, action or proceeding arising out of or relating to this Note, and Borrower hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in the City of New York (or such other county in New York State) may be made by notice to Borrower. Borrower hereby waives any objection that it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum.

Borrower hereby agrees that it shall be bound by any agreement extending the time or modifying the above terms of payment, made by Lender and the owner or owners of the property affected by the Mortgage, whether with or without notice to Borrower, and Borrower shall continue to pay the amount due hereunder, but with interest at a rate no greater than the Interest Rate (or the Involuntary Rate if otherwise applicable under this Note), according to the terms of any such agreements of extension or modification.

Time is of the essence as to all dates set forth herein, <u>provided, however,</u> that whenever any payment to be made under this Note shall be stated to be due on a Saturday, Sunday or a day which shall be in the State of New York a legal holiday or day on which banking institutions are required or authorized to close (any other day being a "**Business Day**"), such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in computing interest and fees in connection with such payment.

Borrower acknowledges that it has no offsets, defenses or counterclaims to the payment of this Note.

8

This Note and all documents executed in connection herewith have been reviewed and negotiated by Borrower and Lender at arms length with the benefit of the assistance of legal counsel and shall not be construed against either party.

This Note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

Borrower hereby, knowingly, voluntarily, intentionally, expressly and unconditionally waives, in connection with any suit, action or proceeding brought by Lender based upon, arising out of, under or in connection with this Note, or any other documents contemplated to be executed in connection herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of any party, any and every right it may have to (i) injunctive relief (other than injunctive relief granted in connection with any such suit, action or proceeding brought by Lender on this Note), (ii) interpose any counterclaim therein (other than a counterclaim brought under this Note that cannot be maintained in any separate action) and (iii) have the same consolidated with any other or separate suit, action or proceeding. Nothing herein contained shall prevent or prohibit Borrower from instituting or maintaining a separate action against Lender with respect to any asserted claim. Borrower acknowledges that the aforesaid waiver constitutes a material inducement for Lender to accept this Note and make the loan which is evidenced by this Note.

**BORROWER AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS NOTE OR ANY OTHER LOAN DOCUMENTS CONTEMPLATED TO BE EXECUTED IN CONNECTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN EVIDENCED BY THIS NOTE OR ENFORCEMENT OF THE LOAN DOCUMENTS EVIDENCING AND/OR SECURING THE LOAN, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, BORROWER HEREBY WAIVES ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWER CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS NOTE AND MAKE THE LOAN.**

Borrower hereby grants to Lender, a continuing lien, security interest and right of setoff as security for all liabilities and obligations to Lender whether now existing or hereafter arising,

upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Lender or any entity under the control of Lender, or under common control or affiliated with Lender and its and their respective successors and/or assigns or in transit to any of them. At any time, without demand or notice (any such notice being expressly waived by Borrower), Lender may setoff the same or any part thereof and apply the same to any liability or obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral security for the loan which is evidenced by this Note. **ANY AND ALL RIGHTS TO REQUIRE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LOAN WHICH IS EVIDENCED BY THIS NOTE PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

Lender may at any time pledge or assign all or any portion of its rights under the loan documents which evidence and/or secure the loan evidenced by this Note, including any portion of this Note, to any of the twelve (12) Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341. No such pledge or assignment or enforcement thereof shall release Lender from its obligations under any of the loan documents which evidence and/or secure the loan evidenced by this Note.

Should the indebtedness represented by this Note or any part thereof be collected at law or in equity, or in bankruptcy, receivership or any other court proceedings (whether at the trial or appellate level), or should this Note be placed in the hands of attorneys for collection upon default, Borrower agrees to pay, in addition to the principal, interest and other sums due and payable hereon, all costs of collecting or attempting to collect this Note, including attorneys' fees and expenses. After and during the continuance of any default hereunder or an "Event of Default", as that term is defined in the Mortgage, the rate of interest hereunder shall be the Involuntary Rate.

All payments due under this Note shall be made by Borrower to Lender at 120 Broadway, 16th Floor, New York, New York 10271 or such other place as Lender may from time to time specify in writing in lawful currency of the United States of America in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments.

If any section or provision of this Note is declared invalid or unenforceable by any court of competent jurisdiction, said determination shall not affect the validity or enforceability of the remaining terms hereof. No such determination in one jurisdiction shall affect any provision of this Note to the extent it is otherwise enforceable under the laws of any other applicable jurisdiction.

Any check, draft, money order or other instrument given in payment of all or any portion of this Note may be accepted by the Lender and handled in collection in the customary manner, but the same shall not constitute payment hereunder or diminish any rights of the Lender, except to the extent actual cash proceeds of such instruments are unconditionally received by the Lender and applied to the indebtedness in the manner provided in this Note.

Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of this Note or any other security document which is not of public record, and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of this Note or other security document, Borrower will issue, in lieu thereof, a replacement note or other security document in the same principal amount thereof and otherwise of like tenor.

NYC 301815.2

IN WITNESS WHEREOF, the Borrower has duly executed this Note as of the Date of Note.

                **RIVERROCK NEHEMIAH REALTY LLC,**
                a New York limited liability company

                By:   Guytech Management Services, Inc.

                By: _____
                      Joseph Norton
                      President

                Having an address at:
                771 Thomas S. Boyland Street
                Brooklyn, New York 11212